UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

LORI ANN R.,[1]

        Plaintiff,

v.

                                        Civil Action No. 2:22-cv-508

KILOLO KIJAKAZI,
*Acting Commissioner of*
*Social Security*,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Lori Ann R. seeks judicial review of the Commissioner of Social Security's denial of her claim for supplemental security income benefits ("SSI") under the Social Security Act ("the Act"). Specifically, Plaintiff argues that the Commissioner's Administrative Law Judge ("ALJ") improperly evaluated opinion evidence from Plaintiff's treating providers. As a result, she argues that the ALJ's residual functional capacity ("RFC") determination is the product of legal error and not supported by substantial evidence. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. This Report concludes the ALJ adequately considered the medical opinion evidence in the record, and therefore recommends that the court grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

# I.   PROCEDURAL BACKGROUND

Plaintiff protectively filed for SSI under Title XVI of the Act on May 22, 2020.  (R. 45, 66, 78, 186–95).  She alleged disability beginning November 24, 2012, based on the following conditions: manic depressive disorder; PTSD; bipolar disorder type 1; mild cognitive impairment; major depressive disorder, moderate; trauma or stressor related disorder; and anxiety about health, rule out somatoform disorder.  (R. 67, 79, 207).  The state agency denied her application initially and on reconsideration.  (R. 66, 78).  Plaintiff then requested an administrative hearing.  (R. 88–90).  The hearing was held on January 13, 2022.  (R. 36–65).  Plaintiff was represented by counsel, and an impartial vocational expert ("VE") testified.  Id.  At the hearing, Plaintiff amended her alleged onset date to May 22, 2020.  (R. 42).

On February 25, 2022, the ALJ denied Plaintiff's claim for SSI, finding she was not disabled during the period alleged.  (R. 18–31).  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 21–24).  The ALJ also found that Plaintiff's RFC permitted her to perform work within the national economy.  (R. 29–30).  On October 6, 2022, the Appeals Council denied Plaintiff's request for review.  (R. 4–9).

On December 8, 2022, Plaintiff filed her complaint in this court.  Compl. (ECF No. 1).  She seeks judicial review of the Commissioner's final decision that she was not disabled, claiming that "[t]he conclusions and findings of fact of the [ALJ] are not supported by substantial evidence and are contrary to law and regulation."  Id. ¶ 8 (ECF No. 1, at 2).  On March 6, 2023, Plaintiff filed a brief in support of her appeal. (ECF No. 9).  Plaintiff argues that the case should be reversed or remanded because the ALJ "failed to properly evaluate the opinions of Scott Gerwe, D.O., and Elizabeth M. Koivisto, L.P.C."  Pl.'s Mem. Support Social Security Appeal ("Pl.'s Mem.") (ECF

No. 9, at 8). As a result of these errors, Plaintiff contends that the ALJ's decision to deny her claim for SSI is not supported by substantial evidence. Id. at 8–24.

On April 5, 2023, the Commissioner opposed Plaintiff's brief and moved for summary judgment.[2] (ECF No. 10). The Commissioner argues that the ALJ properly evaluated the opinion evidence of record, and that the ALJ's findings are supported by substantial evidence. Mem. Supp. Def.'s Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 10, at 13–23). Plaintiff replied. (ECF No. 11). After a review of the record, this Report considers each of these arguments.

## II.    FACTUAL BACKGROUND

Plaintiff was born on December 22, 1965, and at the time of the ALJ's decision, she was 56 years old. (R. 29). She has not engaged in substantial gainful activity since May 22, 2020, the alleged onset date. (R. 20). She completed two years of college and reported past work as a medical assistant. (R. 29, 208).

### A.    Plaintiff's Health Treatment

Plaintiff's arguments in this court do not require a complete review of her medical history, as she disputes only the ALJ's assessment of certain medical opinions. The treatment Plaintiff received, as relevant to the briefs before the court, is outlined below.

During the alleged period of disability, Plaintiff treated with several primary care providers at Bon Secours, including Jocelyn C. Ricasa, M.D. On June 11, 2020, Plaintiff had a virtual

---

[2] Under the new Supplemental Rules for Social Security Actions, effective December 1, 2022, appeals from final decisions of the Social Security Administration are presented for decision by the parties' briefs, regardless of whether they move for summary judgment. Supp. R. Soc. Security Actions Under 42 U.S.C. § 405(g), Rule 5. As both parties have filed their briefs on this matter pursuant to the undersigned's Briefing Order, (ECF No. 7), this matter is ripe for review under the new rules. Because the Commissioner styled the brief as a separate motion for summary judgment, this report recommends resolution consistent with the procedure reflected in the pleadings.

encounter with Dr. Ricasa and demonstrated full passive range of motion without pain. (R. 376). She was alert and cooperative, and had normal attention, perception, mood, affect, speech, behavior, cognition, and memory. Id. Dr. Ricasa assessed Plaintiff with controlled type 2 diabetes, "ongoing low back pain,"[3] acquired hypothyroidism, and stage 3 chronic kidney disease. (R. 373).

During the alleged period of disability, Plaintiff also received mental health treatment from providers at Hampton Roads Behavioral Health. On June 15, 2020, Plaintiff met with Sherrill Marshall, PMHNP, for a medication management appointment. (R. 483–84). She reported that she was doing "doing ok" and that her anxiety was "not too bad." (R. 483). She said she was sleeping at intervals, waking twice per night, and getting out to take walks. Id. On mental examination, Plaintiff maintained appropriate eye contact, affect, and psychomotor activity. Id. She denied suicidal ideation or psychotic features. Id. She was alert and oriented, and her judgment and insight were within normal limits. Id. Marshall noted a primary diagnosis of bipolar disorder. (R. 484).

As part of her treatment with Hampton Roads Behavioral Health, Plaintiff also had periodic therapy sessions with Elizabeth Koivisto, LPC. Plaintiff presented for an appointment with Koivisto on July 10, 2020, and appeared in a stable and calm mood. (R. 482). Her sleep was improved, she was complying with her medication regime, and she denied feeling depressed or anxious. Id. Plaintiff reported having a nightmare about her pets and missing her mother on the anniversary of her death. Id. Like Marshall, Koivisto noted a primary diagnosis of bipolar disorder. Id.

---

[3] Specifically, Dr. Ricasa assessed facet arthritis of the lumbar region, fibromyalgia muscle pain, and a bulging lumbar disc. (R. 373).

4

Plaintiff met with Koivisto again on July 31, 2020. (R. 481). She "presented with [a] cheerful mood and demeanor, reporting that she recently enjoyed an outing with her best friend." Id. However, Plaintiff said August is typically difficult for her due to the anniversary of her fiancé's murder in 1989. Id. She described feeling sadness, hopelessness, regret, and being cheated out of more time together. Id. After talking through her emotions with Koivisto, Plaintiff said she felt "better." Id.

Plaintiff had another medication management appointment with Marshall on August 3, 2020. (R. 479–80). She was in a good, steady mood and reported getting out a bit more. (R. 479). On mental examination, Plaintiff was alert and oriented and maintained appropriate eye contact, affect, and psychomotor activity. Id. Her thought processes and content were within normal limits, as were her judgment and insight. Id.

On August 24, 2020, Plaintiff reported for another therapy session with Koivisto. (R. 478). She presented in a cheerful and calm mood, claiming that she was coping well and managing her daily stressors effectively. Id. Plaintiff told Koivisto she had started helping around the house more often, which had helped decrease stress between her and her sister. Id.

A week a later, on August 31, 2020, Plaintiff had a virtual encounter with Dr. Ricasa and reported dizziness. (R. 502). As before, she was alert and cooperative and demonstrated a full passive range of motion without pain. (R. 505). She had normal attention, perception, mood, affect, speech, behavior, cognition, and memory. Id.

During the alleged period of disability, Plaintiff also received nephrology treatment from Melbeth M. Lusica, M.D., of Tidewater Kidney Specialists. On September 21, 2020, Plaintiff met with her Dr. Lusica and denied any edema, shortness of breath, or problems with urination. (R. 471–72). Dr. Lusica noted Plaintiff's kidney disease diagnosis from 2015, which resulted from

5

acute renal failure. (R. 471). She assessed Plaintiff with stage 3 chronic kidney disease and indicated the condition had been worsening since diagnosis. (R. 471, 473).

On September 24, 2020, Plaintiff met with Koivisto again. (R. 477). She presented with a "cheerful mood and demeanor, increased energy and motivation, little stress and improved sleep." Id. She disclosed that her main stressors were ongoing home renovations and her sister's knee surgery. Id. Plaintiff reported nightmares and anxious dreams about her former fiancé, but also indicated that she had recently visited a friend and going out "felt good." Id.

The next month, Plaintiff told Koivisto that she was providing post-surgery care for her sister and that five additional family members had moved into her home. (R. 476). She presented with decreased mood, elevated stress, frustration, and poor sleep for three nights. Id. She said the home felt "chaotic," but indicated she was coping by having alone time in her room, visiting a friend, praying, and using an app that produces relaxing rain sounds. Id.

Dr. Ricasa virtually consulted Plaintiff again on November 30, 2020. (R. 494–500). She noted that Plaintiff had met with her nephrologist and that her kidney disease was stable. (R. 496). On examination, Plaintiff demonstrated full passive range of motion without pain. (R. 499). As before, Plaintiff was alert and cooperative and had normal attention, perception, mood, affect, speech, behavior, cognition, and memory. Id. Dr. Ricasa assessed Plaintiff with the same conditions as her previous appointment. (R. 495).

Plaintiff had another therapy session with Koivisto on December 3, 2020. (R. 531–32). She "presented with improved mood, reduced anxiety and reporting less stress in the home since [her] last session." Id. She also said she was sleeping better following the addition of melatonin to her medication regime, but missed her mother and felt sad during the holidays. Id. Plaintiff

inquired about a family therapy session to include her sisters, which was scheduled for January 2021. Id.

At her next appointment—a medication management visit with Marshall on January 13, 2021—Plaintiff reported improved sleep, steady moods, and efforts to get out more often. (R. 533). She said she was "doing better" and denied anger or agitation, but disclosed that she was denied Social Security benefits and planned to appeal. Id. On mental examination, Marshall found Plaintiff to be alert and oriented with normal insight, judgment, and behavior. Id.

The next month, Plaintiff presented to Koivisto in a calm and stable mood. (R. 535). Plaintiff disclosed that she broke her foot, which had impacted her mobility, and told Koivisto the previously scheduled family therapy session was postponed indefinitely. Id. She also reported increased stress in the house and identified housework as her main stressor. Id. A few weeks later, Marshall noted that Plaintiff was continuing to do well. (R. 536). As at her previous appointments, Plaintiff demonstrated normal findings on mental examination. Id.

On March 23, 2021, Plaintiff had a virtual encounter with Dr. Ricasa. (R. 573–78). She demonstrated full passive range of motion without pain. (R. 577). She was alert and cooperative, and had normal attention, perception, mood, affect, speech, behavior, cognition, and memory. Id. Dr. Ricasa again assessed chronic low back pain, type 2 diabetes, hypothyroidism, and chronic kidney disease. (R. 574). The next day, Plaintiff returned to Hampton Roads Behavioral Health for another therapy session with Koivisto. (R. 538). Her mood was improved, and she was feeling less depressed. Id. She also reported increased energy and motivation. Id. Home renovations continued to be a source of stress, but she was coping by getting out of the house more often, visiting a friend, reading, and taking time for herself. Id.

Plaintiff's next appointment with Koivisto was on April 28, 2021. (R. 539). Koivisto noted Plaintiff's calm and steady mood, and her denial of depression or anxiety. Id. Plaintiff reported getting out more with her friend, getting along well with her family, and an improved relationship with her sister due to her helping with more housework. Id. The following month, Plaintiff presented to Marshall in a good mood and indicated she continued to get along with her family and sleep well. (R. 540). She told Marshall her therapy sessions with Koivisto had been very helpful. Id. Once again, all of Plaintiff's mental examination findings were normal or within appropriate limits. Id.

Plaintiff met with Marshall again on July 13, 2021. (R. 542–43). She endorsed nightmares of being violently attacked, which cause her to wake up with her heart racing. (R. 542). Marshall authorized a slight increase in her Xanax dosage to account for this problem but noted that Plaintiff was otherwise doing ok. Id. Her judgment, cognition, affect, and behavior were all normal. Id.

Plaintiff met with Koivisto three times in August 2021. On August 2, Plaintiff presented with a depressed mood and increased stress. (R. 544). She endorsed fatigue, feeling overwhelmed, and violent, untriggered nightmares three to four times per week for the past two weeks. Id. She reported isolating and said, as she had the previous year, that August was a "rough month" because of the anniversary of her fiancé's death. Id. Plaintiff's sister was invited into the session and expressed concerns regarding Plaintiff's "depressed mood, lack of socializing, accuracy of diagnosis, and difficulty attaining disability [benefits]." Id. Plaintiff denied suicidal or homicidal ideations but expressed concern about dealing with family, stress, and noise in her home, as well as nightmares and broken sleep. Id. She indicated she could cope by wear noise-cancelling headphones around the house and taking walks early in the day. Id.

Plaintiff returned on August 16 and told Koivisto she had slept no more than three hours per night for two weeks. (R. 545). She claimed she had not altered her bedtime routine during her periods of insomnia. Id. Plaintiff presented with extreme fatigue and endorsed "nervousness" about her upcoming disability hearing. Id.

On August 25, Plaintiff presented with a low mood, moderate engagement, and blunt affect. (R. 546). She reported improved sleep following an adjustment in her medication, but endorsed feeling concerned about her disability benefits application and the possibility of having to return to work. Id. She expressed feelings of fear towards people and explained that she shuts down when afraid or uncomfortable. Id. Plaintiff said she was increasingly isolating at home and rarely leaving on her own. Id. Following this dialogue with Plaintiff, Plaintiff's sister was invited into the session. Id. She confirmed that Plaintiff was "very depressed," rarely left her room, and increasingly slept during the day to make up for lost sleep at night. Id. She also expressed concern about Plaintiff's potential return to work given her fear of being around people and leaving the house alone. Id. Plaintiff's sister also disclosed five "break downs" Plaintiff experienced in the past five years. Id. Koivisto urged Plaintiff to be more forthcoming in her therapy sessions, but Plaintiff responded that she had difficulty sharing her feelings. Id.

On September 8, 2021, Plaintiff returned for another session with Koivisto. (R. 547). She presented in a low, agitated mood with congruent affect. Id. Her engagement and eye contact were varied, and she reported feeling anxious and "freaked out" because she lost her identification card. Id. Plaintiff indicated she was taking liquid cannabis in the evening, which had improved her sleep to five to six hours per night. Id.

About a week later, Plaintiff met with providers at Bon Secours for a flu shot and to establish care with her new primary care provider, Kristin H. Negron, D.O. (R. 561–72). She

reported frequent nightmares, but also improved sleep following a recent increase in her Seroquel dosage. (R. 567). She also endorsed back pain. (R. 570). Dr. Negron conducted a physical examination and found that Plaintiff was alert and oriented and had normal coordination, speech, behavior, thought content and judgment. (R. 571). However, her memory was impaired. Id. She was assessed with controlled type 2 diabetes, stage 3 chronic kidney disease, chronic pain syndrome, Crohn's disease, bipolar affective disorder, and proteinuria. (R. 463–64).

The next day, Plaintiff met with Marshall. (R. 548). Her mood was mostly good, although she indicated she had some down days. Id. She said she was sleeping a little better and was smoking marijuana to help her sleep. Id. Plaintiff denied anger issues but disclosed an intent to appeal a recent denial of her application for Social Security disability benefits. Id. On mental examination, Marshall noted similar findings to her previous consultations with Plaintiff: normal behavior, eye contact, psychomotor activity, cognition, thought processes, judgment and insight. (R. 548–49). She also noted that Plaintiff's focus and concentration seemed within normal limits. (R. 548).

On September 22, 2021, Plaintiff had another encounter with Koivisto. (R. 550). She said her home was quieter and calmer because the children had returned to school, which made her feel less anxious. Id. She disclosed plans to socialize with her friend during the upcoming weekend, but also said she missed her deceased grandmother. Id. Plaintiff's mood was moderate with a congruent and "somewhat flat" affect. Id. She also talked through her work history and struggles that led to her leaving her previous job in the medical field. Id.

Plaintiff reported to her nephrologist, Dr. Lusica, on October 28, 2021. (R. 632–37). Dr. Lusica conducted a physical examination and found Plaintiff alert and oriented with normal mood, and associations. (R. 636). Her gait, senses, and motor control were also intact. Id. Plaintiff

denied edema, shortness of breath, and urination problems, and Dr. Lusica affirmed her prior assessment of stage 3 chronic kidney disease. (R. 632, 636).

On December 28, 2021, Plaintiff had another encounter with Dr. Lusica. (R. 638–44). Plaintiff again demonstrated normal physical examination findings, but Dr. Lusica noted her latest creatinine levels indicated worsening kidney functioning. (R. 638, 643). A kidney biopsy was planned to rule out an autoimmune process affecting Plaintiff's kidneys. Id. Despite Plaintiff's worsening kidney functioning, Dr. Lusica again assessed stage 3 chronic kidney disease. (R. 643). Plaintiff presented to Sentara Virginia Beach General Hospital for her kidney biopsy on January 3, 2022. (R. 620–29). At the time of discharge, she had normal range of motion and was ambulating. (R. 628).

Following her kidney biopsy, Plaintiff had a virtual encounter with Dr. Lusica on January 12, 2022. (R. 645–48). Dr. Lusica noted that the biopsy showed an acute tubular injury and was complicated by a hematoma, which required a blood transfusion. (R. 645). She concluded Plaintiff's chronic kidney disease remained at stage 3 and directed Plaintiff to return to the clinic in three months. (R. 647). However, later treatment notes from Dr. Negron indicate that Plaintiff's chronic kidney disease subsequently progressed to stage 4. (R. 649–50).

**B.     Opinion Evidence**

**1.     Consultative Examiners**

**a.     State Agency Examiners**

When Plaintiff's claim was pending at the initial level, state agency consultant William Rutherford, M.D., conducted a review of Plaintiff's medical records. (R. 73–74). Regarding her exertional abilities, he opined that Plaintiff had unlimited movement in her upper and lower extremities, except that she could only occasionally lift and/or carry 50 pounds and frequently lift

and/or carry 25 pounds. (R. 74). He also concluded that Plaintiff could stand and/or sit for a total

of approximately six hours in an eight-hour workday. Id. Regarding Plaintiff's postural

limitations, Dr. Rutherford opined that she was unlimited in her ability to crawl and kneel, and

could frequently climb ramps, stairs, ladders, ropes, or scaffolds; balance; stoop; and crouch. Id.

He indicated that his assessment was based on the fact that Plaintiff's kidney disease appeared to

be stable, she was receiving treatment for her back pain, and her pain did not appear to limit her

ability to carry out normal, daily activities. Id.

Plaintiff's records were also reviewed by state agency consultant Jo McClain, Psy.D., who

evaluated Plaintiff's mental functioning. (R. 75–76). She opined that Plaintiff was moderately

limited in the following areas: understanding and remembering detailed instructions; carrying out

detailed instructions; maintaining attention and concentration for extended periods; completing a

normal workday and workweek without interruptions from psychologically based symptoms and

performing at a consistent pace without an unreasonable number and length of rest periods;

interacting with the public; accepting instructions and responding appropriately to criticism from

supervisors; getting along with coworkers or peers without distracting them or exhibiting behavior

extremes; and responding appropriately to changes in the work setting. Id. In all other areas, she

found that Plaintiff was not significantly limited. Id. Given those limitations, Dr. McClain

concluded that Plaintiff was "capable of understanding and remembering simple

instructions . . . capable of persisting in simple tasks for two hour blocks to complete a normal

workday/workweek . . . capable of at least occasional direct interaction with [the] public,

supervisors, and co-workers . . . and [a]ble to adjust to occasional or predictable changes in work

setting." Id.

When Plaintiff's claim was pending at the reconsideration level, state agency consultant Jack Hutcheson, M.D., conducted a review of Plaintiff's medical records. (R. 84–85). Dr. Hutcheson's findings were identical to those made by Dr. Rutherford at the initial level, and Dr. Hutcheson opined that "the initial level decision was correct." (R. 84). Plaintiff's records were also reviewed by state agency consultant Howard Leizer, Ph.D., who opined on Plaintiff's mental functioning. (R. 85–86). Dr. Lezier's findings were identical to those made by Dr. McClain at the initial level, and Dr. Leizer likewise opined that "the initial level decision was correct." Id.

### b.   Scott Gerwe, D.O.

On December 20, 2020, Scott Gerwe, D.O.—who was not a state agency examiner—conducted a consultative examination. (R. 518–23). He found that Plaintiff was alert and oriented with good eye contact and fluent speech. (R. 522). Her mood was appropriate, she had clear thought processes, her memory was normal, and her concentration was good. Id. She scored 30/30 on a mini-mental examination. Id.

Plaintiff also had a steady gait and ambulated normally without the use of an assistive device. (R. 523). Her hand-eye coordination was good, her senses were intact, and her straight leg test was positive in both legs at 45 degrees. Id. She had weakness in her left lower extremity and tenderness in her lower back, but no joint swelling, erythema, effusion, or deformities. Id. Plaintiff was able to button and unbutton a shirt, pick up a coin, grasp a pen, write a sentence, and maneuver light objects. Id. She could also squat and rise from a squatting position with only mild difficulty, rise from a sitting position without assistance, and get up and down from the exam table without difficulty. Id. She was unable to stand or hop on either foot but could walk on her heels and toes and perform a tandem walk. Id.

Based on these findings, Dr. Gerwe opined as follows:

13

> [t]he claimant can be expected to sit normally in an 8-hour workday with normal breaks. The claimant can be expected to stand 60 minutes and walk 90 minutes, at a time in an 8-hour work day before requiring a break due to back pain. The claimant does need an assistive device with regards to short and long distances and uneven terrain. The claimant can be expected to carry 20 pounds frequently and 25 pounds occasionally. There are limitations on bending, stooping, crouching, squatting, and so on and the claimant will be able to perform these occasionally due to back pain. There are no manipulative limitations on reaching, handling, feeling, grasping, fingering, pushing, pulling, and the claimant will be able to perform these frequently. There are no relevant visual, communicative or work place environmental restrictions.

Id.

### 2.     Plaintiff's Treating Providers

#### a.     Elizabeth Koivisto, LPC

On November 8, 2021, Koivisto completed a medical evaluation report, which is a checkbox form listing certain questions about Plaintiff's work capabilities. (R. 551–52). On the form, she noted Plaintiff's bipolar disorder and PTSD diagnoses and explained that she "struggle[s] with intermittent depressed mood and daily anxiety which impairs [her] ability to leave her home independently, socialize with others and navigate social and work situations without continuous support from a trusted family member." (R. 551). She described Plaintiff's prognosis as "moderately poor." Id.

Additionally, Koivisto opined that, because of her condition, Plaintiff had a "mild" limitation in her ability to make simple work-related decisions and "moderate" limitations in her ability to remember locations and work-like procedures; perform activities within a schedule, maintain regular attended, and be punctual within customary tolerances; and sustain an ordinary routine without special supervision. Id. She found no limitations in Plaintiff's ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain

socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. (R. 552).

Koivisto also indicated that Plaintiff had "marked" limitations[4] in the following areas: understanding and remembering short and simply instructions; carrying out very short and simple instructions; maintaining attention and concentration for extended periods; asking simple questions or requesting assistance; accepting instructions or responding appropriately to criticism from supervisors; traveling to unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others. (R. 551–52). Finally, she opined that Plaintiff had "extreme" limitations[5] in the following additional areas: understanding and remembering detailed instructions; carrying out detailed instructions; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to customary stresses in a work setting. Id.

## C.    Testimony Before the ALJ

At the hearing on January 13, 2022, the ALJ heard testimony from Plaintiff, her sister, and impartial VE, James Ganoe. (R. 45–64).

### 1.    Plaintiff's Testimony

On direct questioning by the ALJ and her attorney, Plaintiff testified that she lives with her sister and her sister's husband, as well as her other sister and that sister's two minor grandchildren.

---

[4] The checkbox form defined "markedly limited" to mean that the "[p]atient has serious limitation in this area but function is not completely precluded. (R. 551).

[5] The form defined "extreme limitation" to mean a "[d]egree of limitation that is incompatible with the ability to do any gainful activity." (R. 551).

(R. 48).  She said she spends a normal day isolating inside her room, sitting up in her adjustable bed.  (R. 48–49).  However, she explained that she gets "up and down" to do laundry, wash dishes, clean bathrooms, and carry out similar household chores.  (R. 50).

As to her medical history, Plaintiff testified regarding her kidney disease diagnosis.  She claimed that her kidney disease caused lower back pain which prevents her from standing or sitting too long.  (R. 46, 49).  She also indicated that she has to take breaks when doing chores because of her back pain.  (R. 51).  She said that, while sitting in bed each day, she changes positions often and keeps her legs elevated to prevent pain.  (R. 49–50).  Although the length of time she keeps her legs elevated depends on how often she gets up to do chores, she estimated they were elevated for approximately five hours per day.  (R. 50–51, 53).

Regarding her mental health, Plaintiff testified that she treated with Hampton Roads Behavioral Health from her amended onset date through the date of the hearing.  (R. 45, 47).  She said she returns every three months to see a nurse practitioner, and every two weeks to see Koivisto.  Id.  She clarified that, since her amended onset date, she had not received any inpatient mental health treatment.[6]  (R. 45–46).  However, she described experiencing daily depression and anxiety, and having flashbacks or nightmares related to PTSD a couple of times per week.  (R. 47–48).  She disclosed that she was taking Xanax, but that it was not helping.  Id.  Additionally, she testified that she was diagnosed with neurocognitive disorder related to her PTSD which hinders her memory and ability to concentrate.  (R. 51).

_____

[6] Plaintiff did disclose that she did report to the hospital a week prior to the hearing for her kidney biopsy and was required to stay overnight for that procedure.  (R. 46).  While at the hospital, she tested positive for COVID-19, which delayed her release for a few additional days.  Id.  She was still recovering from her COVID-19 symptoms at the time of the hearing.  (R. 52).

16

## 2.   Testimony from Michelle Hobbs

Plaintiff's sister, Michelle Hobbs—with whom Plaintiff has lived since 2019—also testified at the hearing. (R. 55). Hobbs testified that she works as a medical assistant but was not currently working at the time of the hearing. (R. 57). She confirmed that Plaintiff spends her time isolating in her room watching television from her adjustable bed unless she is going to a doctor's appointment, running errands, or making a cup of tea in the morning. (R. 57–58). She also confirmed that Plaintiff does not like being around people other than family, and that she elevates her legs to prevent back pain. (R. 55–57). Hobbs said she asks Plaintiff to help with chores one to two days per week, but that Plaintiff otherwise stays in her room from approximately 8:00AM until dinner. (R. 57–58). She indicated that Plaintiff still has a driver's license but stopped driving in 2020. (R. 56).

Regarding Plaintiff's health, Hobbs testified that Plaintiff suffers from severe depression, PTSD, and a neurocognitive disorder which were initially caused by the murder of Plaintiff's fiancé, but subsequently exacerbated by a divorce and the sudden death of their mother. (R. 55, 57–58). She said Plaintiff has a difficult time staying focused and completing normal activities like washing the dishes, such that Hobbs has to "guide her" to finish the task. (R. 56). She also noted that Plaintiff is diabetic, has bipolar disorder, and experiences panic attacks. (R. 59). Hobbs identified herself as Plaintiff's caregiver and explained that she takes Plaintiff to all her doctors' appointments. (R. 55–58).

## 3.   Testimony from VE Ganoe

James Ganoe is an impartial VE. (R. 36, 60). At the hearing, the VE testified that Plaintiff's past work would be classified as a medical assistant (DOT 079.362-010), which would

entail light work as typically performed and as actually performed by Plaintiff. (R. 60). The ALJ's

subsequent hypothetical posited a person with the same age, education, and work experience as

Plaintiff who was capable of work at the medium exertional level with the following limitations:

> The individual would have frequent balancing, stooping, crouching,
> kneeling, and crawling, and climbing; with occasional ladders,
> ropes, or scaffolds. The individual can do simple, routine tasks, but
> no complex tasks; and a low stress environment defined as
> occasional decision making and occasional changes in the work
> setting; and frequent interaction with supervisors; occasional
> interaction with coworkers and [the] public.

(R. 61). The VE testified that Plaintiff's past relevant work would not be available "[t]he past

work was skilled." Id. However, he testified that some medium exertional level jobs would be

available to such a person, including the following: linen room attendant (DOT 222.387-030) with

30,000 jobs nationally; laundry worker I (DOT 361.684-014) with 200,000 jobs nationally;

warehouse laborer (DOT 922.687-058) with 335,000 jobs nationally. Id.

The ALJ then modified the hypothetical from frequent interaction with supervisors to

"occasional [contact with] supervisors after the training period," and additionally limited the

individual to "no team type setting"[7] and "no interactions with the public." (R. 62). The VE

testified that those changes would have no effect on the availability of the jobs he previously

described. Id. When asked whether the jobs described would be available if the individual was

limited to light exertion work, the VE testified that they would not. Id. However, upon further

inquiry from the ALJ the VE clarified that under the ALJ's first and second hypotheticals, the

following light jobs would be available: price marker (DOT 209.587-034) with 79,000 jobs

---

[7] Despite the addition of the limitation on working in a team setting, the ALJ's hypothetical retained the
limitation to occasional interaction with coworkers. (R. 62).

nationally; hand packer (DOT 920.687-166) with 196,000 jobs nationally; and garment sorter (DOT 222.687-014) with 73,000 jobs nationally.  Id.

Plaintiff's counsel then posited the same hypothetical with the additional assumption that the individual "needed to take a break for an hour in the morning, and a break in the afternoon for an hour as well . . . above any normal lunch break or morning or afternoon break." (R. 63).  The VE testified that extra breaks of that nature would not be tolerated.  Id.  He went on to testify that employers would only tolerate an individual being off-task 10% of the day.  Id.

### III.     STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and

must be affirmed.  Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017).  Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.  ANALYSIS

Plaintiff's brief identifies only one error in the ALJ's decision that she claims warrants remand.  She contends that the ALJ "failed to properly evaluate the opinion evidence," thereby producing an RFC determination not supported by substantial evidence.  Pl.'s Mem. (ECF No. 9, at 8–24).  As explained below, this Report finds that the ALJ properly evaluated the opinion evidence at issue.  Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

### A.  Framework for SSA Disability Evaluation

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d).  As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a).  An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 404.1520(a)(4).  Specifically, the regulations direct the ALJ to answer the following five questions:

1.   Is the individual involved in substantial gainful activity?

2.   Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.   Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.   Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.   Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled.  An affirmative answer to questions three or five establishes disability.  The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy.  See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(3); 404.1520b.  This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age."  Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)).  Ultimate responsibility for making factual findings and weighing the evidence rests

with the ALJ. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.      The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date until the hearing date. (R. 20). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc and joint disease of the lumbar spine, chronic pain syndrome, chronic kidney disease, major depressive disorder, anxiety, mild cognitive impairment, and trauma/stress related disorder. (R. 20–21). At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 21–24). The ALJ then developed a finding regarding Plaintiff's RFC. (R. 24). He determined Plaintiff was able

> to perform medium work as defined in 20 CFR 416.967(c) except the claimant can frequently balance, stoop, crouch, kneel, crawl and climb but only occasionally on ladders, ropes, or scaffolds. The claimant can do simple routine tasks but no complex tasks in a low stress environment defined as occasional decision making and occasional changes in work setting. Additionally, she can have occasional interaction with supervisors after the training period, occasional interaction with coworkers but no team type setting work and no interaction with the public.

Id. At step four, the ALJ noted that Plaintiff had no past relevant work. (R. 29). At step five, the ALJ found work in the national economy Plaintiff could perform, and therefore found she was not disabled. (R. 29–31).

**C.      The ALJ's Evaluation of the Opinion Evidence in the Record Complies with the Controlling Regulations and is Supported by Substantial Evidence.**

Plaintiff argues that the ALJ erred by improperly evaluating Dr. Gerwe and Koivisto's respective medical opinions. Pl.'s Mem. (ECF No. 9, at 8–24). The Commissioner argues that the ALJ's evaluation of the opinion evidence in the record is proper and supported by substantial

22

evidence. Def.'s Opp'n (ECF No. 10, at 13–23). Because the ALJ's evaluation of Dr. Gerwe and Koivisto's opinions were appropriate and consistent with SSA regulations, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

### 1.    The ALJ properly evaluated the medical opinion from Dr. Gerwe.

Under the applicable regulations,[8] the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," § 404.1520c(b)(2). Supportability evaluates whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2).

When evaluating a medical opinion under these rules, the ALJ cannot "cherrypick[] facts that support a finding of nondisability while ignoring evidence that points to a disability finding." Bilotta v. Saul, 850 F. App'x 162, 169 (4th Cir. 2021) (quoting Lewis, 858 F.3d at 869); see also Apr. R.D. v. Saul, No. 2:20-cv-210, 2021 WL 3260072, at *9 (E.D. Va. June 29, 2021) (recommending remand because the ALJ "selectively cherry-picked unrepresentative evidence"), R. & R. adopted by 2021 WL 3215093 (E.D. Va. July 29, 2021). Cherry-picking occurs when an

---

[8] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff protectively filed her claims on May 22, 2020, (R. 45, 66, 78, 186–95), the new rules apply.

ALJ focuses on "a single treatment note that purportedly undermines [the source's] overall assessment of [the plaintiff's] functional limitations . . . ." Hudson v. Colvin, No. 12-cv-269, 2013 WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011)).

Here, when explaining her RFC determination, the ALJ first stated that she "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c." (R. 24). Then, assessing Dr. Gerwe's opinion specifically, the ALJ found the opinion to be only "partially persuasive" because

> the treatment records discussed above do show that the claimant has some chronic lower back pain, which at times causes her to have tenderness and reduced strength and would affect her exertional and postural capabilities. However, the degenerative disc disease in her lumbar spine in combination with her chronic kidney disease would not require greater limitations than provided herein by the undersigned's residual functional capacity. Objective testing has been rather benign noting that the claimant has full range of motion in her musculoskeletal system, no edema and normal coordination. Additionally, there is nothing in the records that would support a finding limiting the claimant's upper extremities including lift and carry to range of light, or even to support the stand and walking intervals proposed by the doctor.

(R. 26).

Plaintiff insists that this reasoning is inadequate because the ALJ failed to explain how she considered the supportability factor and consistency factors. Pl.'s Mem. (ECF No. 9, at 10–14). With regard to the supportability analysis, Plaintiff believes the ALJ failed to thoroughly explain how she concluded that "nothing in the records" would support limitations on Plaintiff's upper extremities or the standing and walking intervals proposed by Dr. Gerwe—particularly when Dr. Gerwe's consultative examination contained findings lending support to such limitations. Id. at 11–13 (citing R. 26). Specifically, Plaintiff points to Dr. Gerwe's notation that Plaintiff reported

muscle pain, limited range of motion, muscular weakness, and poor muscle coordination at the consultative examination. Id. at 11. She also highlights Dr. Gerwe's findings that Plaintiff had less than full strength in her left hip, demonstrated tenderness in her lower back, had mild difficulty squatting and rising from a squatting position, and only completed the straight leg test at 45 degrees bilaterally. Id. at 11–13. Plaintiff argues the ALJ ignored all of this evidence, choosing instead to cherry-pick favorable facts from the record. Id. at 12. She believes the ALJ's cherry-picking is evidenced by the internal inconsistency between her determination that "nothing in the records" supports Dr. Gerwe's proposed limitations and her finding that Plaintiff's treatment records show chronic lower back pain that sometimes affected her postural and exertional capabilities. Id.

With regard to the consistency analysis, Plaintiff similarly contends that the only statement indicating the ALJ considered evidence from other medical sources when evaluating Dr. Gerwe's opinion is her statement that "nothing in the records" supports the specific limitations Dr. Gerwe imposed. Id. at 13. And nonetheless, Plaintiff argues that statement is undermined by the "totality of the record," which she alleges is consistent with Dr. Gerwe's opinion. Id. In support of that position, Plaintiff highlights treatment she received from other providers for stage 3 chronic kidney disease, dizziness, diabetes, and chronic back pain—the latter of which caused decreased range of motion and tenderness. Id. at 13–14. Plaintiff also targets the ALJ's reference to "benign" testing, arguing that the ALJ failed to consider or explain that much of this testing occurred during virtual encounters due to the COVID-19 pandemic. Id. at 14.

On the other hand, the Commissioner argues that the ALJ's rationale adequately addressed the supportability and consistency factors. Def.'s Opp'n (ECF No. 10, at 15–17). The Commissioner points to the ALJ's discussion of the largely normal findings of Dr. Gerwe's consultative examination in relation to the limitations he imposed. Id. at 16. She also notes the

ALJ's conclusion that Plaintiff's testing was "rather benign" and showed she had "full range of motion in her musculoskeletal system, no edema and normal coordination." Id. (citing R. 26). Additionally, the Commissioner directs the court to the ALJ's discussion and consideration of Plaintiff's hearing testimony—which reflected her ability to perform "robust activities of daily living" such as caring for her sister, visiting friends, and doing chores—and the evaluations conducted by Dr. Rutherford and Dr. Hutcheson, the state agency consultants. Id. at 17.  In short, in the Commissioner's view, the ALJ followed the regulatory framework when considering the record evidence and "reasonably" reached an RFC supported by substantial evidence. See id. at 15–17.  On all of these issues, I agree with the Commissioner.

The ALJ began her discussion of Dr. Gerwe's opinion by noting Dr. Gerwe's conclusion that Plaintiff "could be expected to stand sixty minutes and walk ninety minutes at one time in an eight hour workday with breaks due to back pain." (R. 26).  The ALJ then explained the limitations found in Dr. Gerwe's opinion:

> It was opined she could carry twenty pounds frequently and twenty five pounds occasionally and in terms of postural limitations she would be limited to occasional postural activities.  Additionally, while the doctor said the claimant had no manipulative limitations in the same sentence, he noted she could perform tasks like grasping, fingering, [and] pushing and pulling frequently.

Id.

The ALJ then addressed the supportability and consistency of the opinion as required by 20 C.F.R. § 404.1520c(b)(2), ultimately concluding that the opinion was partially persuasive because it was only partially supported by the evidence in the record. Id.  Regarding supportability and consistency, the ALJ noted that "the treatment records discussed above" indicated Plaintiff experienced "some chronic lower back pain, which at times causes her to have tenderness and reduced strength"—but also that her degenerative disc disease and chronic kidney disease would

not require limitations as extreme as those recommended by Dr. Gerwe.  Id.  The ALJ also noted that "[o]bjective testing has been rather benign" and showed Plaintiff had full range of motion in her musculoskeletal system, no edema and normal coordination."  Id.  Included in "the treatment records discussed above" and the "objective testing" referenced here by the ALJ are (1) the findings from Dr. Gerwe's consultative examination and (2) Plaintiff's examinations with Dr. Ricasa, Dr. Lusica, and other providers.  (R. 24–26).  The ALJ extensively detailed these records in the narrative discussion immediately preceding her analysis of Dr. Gerwe's opinion.  Id.

For example, the ALJ noted that Dr. Gerwe found "slightly reduced" strength in Plaintiff's left hip, but that she otherwise had normal, 5/5 strength in her extremities.  (R. 26).  She noted that Dr. Gerwe observed tenderness in Plaintiff's lower back, but no joint swelling, effusion, or deformity.  Id.  She also mentioned that Dr. Gerwe found Plaintiff's hand-eye coordination and fine motor skills to be intact.  Id.  With regards to other providers, the ALJ noted that testing conducted by Dr. Lusica in 2019 and 2020 indicated Plaintiff's kidney disease was stable.  (R. 25).  She also pointed out Dr. Ricasa's finding that Plaintiff's chronic back pain allowed full range of motion in August 2020 and stable in November 2020.  Id.  She highlighted continued testing by Dr. Ricasa and Dr. Negron, which showed normal musculoskeletal functioning.  Id.  The ALJ's discussion of and reference to this evidence when evaluating Dr. Gerwe's opinion demonstrates that she sufficiently considered the opinion's supportability and consistency as required by the SSA regulations.

Plaintiff points to numerous other pieces of evidence in Dr. Gerwe's consultative examination and treatment notes from other providers that are supportive of and consistent with the conclusions in his opinion, arguing that the ALJ cherry-picked the record for favorable evidence.  Pl.'s Mem. (ECF No. 9, at 11–14).  However, the facts the ALJ used to discount Dr.

Gerwe's medical opinion were representative of the record as a whole.  See Arakas v. Comm'r,

SSA, 983 F.3d 83, 99, 102 (4th Cir. 2020) (finding that the ALJ errs when misstating or

mischaracterizing facts).  As already noted, the ALJ thoroughly detailed the medical record in

support of her RFC, highlighting numerous pieces of evidence contradicting the conclusions in the

portions of Dr. Gerwe's opinion she found less persuasive.  (R. 24–29).  In addition to the facts

outlined above, the ALJ's analysis highlights that Plaintiff had a steady gait at her consultative

examination with Dr. Gerwe and could squat and rise with only mild difficulty, (R. 26); that her

kidney biopsy showed no active inflammation, id.; and that Dr. Rutherford and Dr. Hutcheson

both deemed Plaintiff capable of performing medium work and "frequently perform postural

activities," (R. 28).  All of these facts—and others cited by the ALJ—corroborate the unremarkable

findings from Dr. Gerwe's consultative examination and Plaintiff's encounters with her treating

providers that the ALJ used to discount specific limitations reported in Dr. Gerwe's opinion.  As

such, the ALJ did not cherry-pick the record, and her conclusions regarding the supportability,

consistency, and overall persuasiveness of Dr. Gerwe's opinion are supported by substantial

evidence.

Additionally, reversal is not warranted simply because the record contains evidence which

could support a conclusion opposite from the one reached by the ALJ.  The court must defer to the

ALJ's findings if those findings are supported by substantial evidence.  Perales, 402 U.S. at 390;

see also Lewis, 858 F.3d at 865.  This appeal is not an opportunity to relitigate the case.  If

"conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then

the court defers to the ALJ.  Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640

(7th Cir. 1987)).  Because the ALJ's opinion here is supported by substantial evidence, the court

does not consider whether the evidence might also support an alternative finding.  Thus, there was

no error in the ALJ's evaluation of Dr. Gerwe's opinion and her decision to find the opinion only partially persuasive is supported by substantial evidence.

## 2.      The ALJ properly evaluated the medical opinion from Koivisto.

In the explanation of her RFC determination, the ALJ stated that "[w]hile not a medical source, the undersigned still considered the opinion of Ms. Keivisto [sic], the claimant's licensed counselor." (R. 28).  The ALJ found the opinion unpersuasive because

> the opinion is not made by a doctor but rather a licensed counselor. Moreover, the extreme and marked limitations vary significantly from the counselors own treatment records which note that while the claimant has some ups and downs with feelings and sleep, the claimant continued to have good treatment compliance and was an active participant in her treatment. They further noted the claimant's stability and working on herself.

(R. 29).

As an initial matter, Plaintiff insists that this reasoning is inadequate because, contrary to the ALJ's conclusion, Koivisto is considered a "medical source" under the applicable regulations. Pl.'s Mem. (ECF No. 9, at 18–19).  In other words, Plaintiff argues that because Koivisto is a medical source, it was improper for the ALJ to discount her opinion on the partial basis that she is not.[9] Id.

Plaintiff also argues that the ALJ failed to explain how she considered the supportability and consistency factors. Id. at 19–23.  With regard to supportability, Plaintiff cites several errors.

---

[9] Plaintiff does, however, distinguish between "acceptable medical sources" and "medical sources." Pl.'s Mem. (ECF No. 9, at 18). Under the new SSA rules, an "acceptable medical source" is—depending on the condition(s) at issue—a licensed physician, licensed psychologist, licensed optometrist, licensed podiatrist, qualified speech-language pathologist, licensed audiologist, licensed advanced practice registered nurse, or licensed physician assistant. 20 C.F.R. § 416.902(a). A "medical source," on the other hand, is any "individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law." 20 C.F.R. § 416.902(i). Plaintiff concedes that, under these definitions, Koivisto is not an "acceptable medical source"—but argues that she is nonetheless a "medical source." Pl.'s Mem. (ECF No. 9, at 18).

For one, she believes the ALJ cherry-picked favorable facts from the record and "grossly mischaracterizes LPC's Koivisto's treatment notes to support her ultimate conclusions." Id. at 19. Additionally, she contends that the ALJ's analysis of Koivisto's treatment notes fails to account for the fact that mental health symptoms "wax and wane" over the course of treatment. Id. at 20. Plaintiff also targets the ALJ's use of Plaintiff's compliance, participation, and "stability" in her sessions with Koivisto as reasons to discount Koivisto's opinion, arguing that the ALJ failed to explain how these facts bear on or conflict with the limitations Koivisto imposed. Id. at 21–22.

With regard to consistency, Plaintiff contends that the ALJ's decision is "bereft" of any consideration of "the extent that LPC Koivisto's opinion was consistent with the examination notes of other mental health providers taken throughout the record." Id. at 22. Plaintiff then points to numerous pieces of evidence in the record that, she alleges, are consistent with Koivisto's opinion. Id. at 22–23.

On the other hand, the Commissioner argues that Koivisto is not an "acceptable medical source,"[10] but suggests that determination was not material to the ALJ's analysis because she proceeded to fully assess Koivisto's opinion regardless. Def.'s Opp'n (ECF No. 10, at 19). The Commissioner believes that assessment comported with the applicable SSA regulations, and that the ALJ adequately considered the supportability and consistency of Koivisto's opinion. Id. at 19–20. In support of that position, she points to—among other things—the ALJ's reference to Koivisto's treatment notes documenting largely normal mental health assessments, with some fluctuations in mood. Id. at 19. She also notes the ALJ's discussion of Plaintiff's active participation in her treatment, and her 30/30 score on a mini-mental examination. Id. In short, in

---

[10] As noted above, Plaintiff concedes in her brief that Koivisto is not an "acceptable medical source." Pl.'s Mem. (ECF No. 9, at 18). The Commissioner's brief does not address whether—as Plaintiff asserts, id.— Koivisto is a "medical source."

the Commissioner's view, the evidence on which the ALJ relied in forming her RFC and discounting Koivisto's opinion was substantial and well-explained.

I agree with Plaintiff that Koivisto is a "medical source" because she is "licensed as a healthcare worker."[11] 20 C.F.R. § 416.902(i).  Additionally, because Koivisto is a medical source, her opinion qualifies under the new rules as a "medical opinion.  20 C.F.R. § 416.913(a)(2) (defining a medical opinion as "a statement from a medical source" (emphasis added)).[12]  As such, the ALJ was obligated to evaluate the opinion under the regulatory framework set out in 20 C.F.R. § 404.1520c and above.  See 20 C.F.R. § 404.1520c(b)(1) (stating that the ALJ "will articulate in [their] determination how persuasive [they] find all of the medical opinions").  Here, the ALJ did so notwithstanding her incorrect conclusion that Koivisto is not a medical source.  And while the ALJ did partially discredit Koivisto's opinion because she is not a doctor, the ALJ also found the opinion unpersuasive on other grounds—explained in greater detail below—that independently support the ALJ's conclusion.  Consequently, I find any error in the ALJ's possible misidentification of Koivisto as not a medical source to be harmless.  Having made this determination, the court must now evaluate whether the ALJ's assessment of Koivisto's opinion complies with the applicable rules.  I conclude that it does.

The ALJ began her discussion of Koivisto's opinion by explaining the limitations imposed therein:

---

[11] I also agree with both parties that she is not an "acceptable medical source" because she is not one of the specific types of medical providers identified as such in the rules.  20 C.F.R. § 404.1502(a).

[12] This definition differs from the old rules, which limited medical opinions to "statements from acceptable medical sources," 20 C.F.R. § 404.1527(a)(1) (emphasis added).

> She opined the claimant had extreme limitations in understanding, remembering and carrying out detailed instructions as well as in her ability to work with or in proximity to others without distracting them. It was further opined the claimant had extreme limitations in comp[l]eting a normal workday/week, in interacting with the general public and in responding to customary stresses in the work setting. She opined the claimant had a marked limitation[] in understanding, remembering and carrying out short and simple instructions as well as maintaining attention and concentration for an extended period. Also marked were her ability to ask simple questions or request assistance, accept instruction or criticism from supervisors, travel to unfamiliar places or use public transportation and set realistic goals. Ms. Keivisto [sic] then opined the claimant had a moderate limitation in remembering locations and work-like procedures, in performing activities within a schedule and in sustaining an[] ordinary routine. The claimant had a mild limitation in making simple work related decisions and no limitations in terms of getting along with coworkers, maintaining socially appropriate behavior and being aware of normal hazards.

(R. 28).

The ALJ then addressed the supportability and consistency of the opinion as required by 20 C.F.R. § 404.1520c(b)(2), ultimately concluding that the opinion was unpersuasive because it was not supported by Koivisto's treatment notes. (R. 29). Regarding supportability, the ALJ noted that Koivisto's "own treatment records" consistently noted that Plaintiff was engaged and complying with her treatment. Id. Regarding consistency, the ALJ cited to records from Hampton Roads Behavioral Health that included Marshall's encounter notes, explaining that "[t]hey further noted the claimant's stability and working on herself." Id. The ALJ's discussion of this evidence demonstrates that she sufficiently considered the supportability and consistency of Koivisto's opinion as required by the SSA regulations.

Plaintiff points to numerous other pieces of evidence in Koivisto's treatment notes that are supportive of and consistent with the conclusions in her opinion, arguing that the ALJ cherry-

picked the record for favorable evidence. Pl.'s Mem. (ECF No. 9, at 20–23). However, the facts the ALJ used to discount Koivisto's medical opinion were representative of the record as a whole. See Arakas v. Comm'r, SSA, 983 F.3d 83, 99, 102 (4th Cir. 2020) (finding that the ALJ errs when misstating or mischaracterizing facts). The ALJ thoroughly detailed the medical record in support of her RFC, highlighting numerous pieces of evidence contradicting the conclusions in Koivisto's opinion. (R. 24–29).

For example, the ALJ discussed Dr. McClain and Dr. Leizer's opinions showing that while Plaintiff's mood and memory could fluctuate, she was still capable of performing daily tasks. (R. 28). The ALJ highlighted Plaintiff's 30/30 score on a mini-mental examination conducted by Dr. Gerwe, as well as his finding that Plaintiff had normal memory and good concentration. (R. 27). She also noted Dr. Ricasa's findings in August 2020 that Plaintiff was cooperative and had normal attention, perception, behavior, cognition, and memory. Id. All of these facts—and others specifically cited by the ALJ—corroborate the unremarkable mental examination findings in nearly all of Koivisto's treatment notes that the ALJ used to discount Koivisto's opinion. As such, the ALJ did not cherry-pick the record, and her conclusions regarding the supportability, consistency, and overall persuasiveness of Koivisto's opinion are supported by substantial evidence.

Additionally, as already explained above, reversal is not warranted simply because the record contains evidence which could support a conclusion opposite from the one reached by the ALJ. The court must defer to the ALJ's findings if those findings are supported by substantial evidence. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 865. This appeal is not an opportunity to relitigate the case. If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court defers to the ALJ. Craig, 76 F.3d at 589 (quoting

Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). Because the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding. Thus, there was no error in the ALJ's evaluation of Koivisto's opinion and her decision to find the opinion unpersuasive is supported by substantial evidence.

## V.    **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment, (ECF No. 10), and AFFIRM the final decision of the Commissioner.

## VI.    **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court

34

based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto,

737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

August 25, 2023